1
2
3            UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5
6    CLAUDE STEELE,
7                 Petitioner,                    No. C 06-7470 PJH (PR)
8    vs.                                         **ORDER DENYING PETITION**
                                                 **FOR WRIT OF HABEAS**
9    ROBERT AYERS, JR., Warden,                  **CORPUS**
10                Respondent.
                                        /
11
12         Petitioner, a California prisoner currently incarcerated at San Quentin State Prison,
13    has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254
14    challenging the January 2006 decision by the Board of Parole Hearings ("Board") finding
15    petitioner unsuitable for parole. For the reasons set forth below, the petition will be denied.
16                            **BACKGROUND**
17         The Board summarized the facts of the commitment offense as follows:
18
19              On January 1, 1981, Steele was cited by a Tehama County Sheriff
                Deputy for failing to stop at a stop sign. While the officer was
                issuing the citation, Steele started crying and confessed killing
20              Clarence Baldwin. The Red Bluff Police Department was notified
                and the death was confirmed.
21
                According to the information provided by Steele during his initial
22              confession and during an interview at the Tehama County Jail,
                Baldwin was killed after he made unwanted repeated homosexual
23              advances toward him (Steele).
24    Answer Ex. 9 (Life Prisoner Evaluation Report, January 2006 Calendar).
25         Petitioner pleaded guilty to second degree murder in 1981. Answer Ex. 1 (Abstract
26    of Judgment). He was sentenced to fifteen years to life in prison.
27         On January 10, 2006, petitioner, who was age forty-three and represented by
28    counsel, appeared for his thirteenth parole consideration hearing before a panel of the

United States District Court
For the Northern District of California

1  Board, which denied parole for one year. Answer Ex. 5 at 3 (Cumulative Case Summary).
2  Petitioner filed state habeas petitions in the superior court and court of appeal, which
3  denied relief. Answer Exs. 12, 14. Petitioner filed a petition for review in the state
4  supreme court, which summarily denied review. Answer Ex. 16.

5      On November 2, 2006, petitioner filed a petition for a writ of habeas corpus in the
6  District Court for the Eastern District of California, which transferred the petition to this
7  court. On January 24, 2007, the court ordered respondent to show cause why a writ
8  should not be issued on the cognizable claims. Respondent has filed an answer, and
9  petitioner has filed a traverse. The petition is submitted for a decision on the merits.

## STANDARD OF REVIEW

11      A district court may not grant a petition challenging a state conviction or sentence on
12  the basis of a claim that was reviewed on the merits in state court unless the state court's
13  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an
14  unreasonable application of, clearly established Federal law, as determined by the
15  Supreme Court of the United States; or (2) resulted in a decision that was based on an
16  unreasonable determination of the facts in light of the evidence presented in the State
17  court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law
18  and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09
19  (2000), while the second prong applies to decisions based on factual determinations,
20  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

21      A state court decision is "contrary to" Supreme Court authority, that is, falls under
22  the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to
23  that reached by [the Supreme] Court on a question of law or if the state court decides a
24  case differently than [the Supreme] Court has on a set of materially indistinguishable facts."
25  *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable
26  application of Supreme Court authority, falling under the second clause of § 2254(d)(1), if it
27  correctly identifies the governing legal principle from the Supreme Court's decisions but
28  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

United States District Court
For the Northern District of California

1 federal court on habeas review may not issue the writ "simply because that court concludes
2 in its independent judgment that the relevant state-court decision applied clearly
3 established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must
4 be "objectively unreasonable" to support granting the writ. *Id.* at 409.

5     Under Section 2254(d)(2), a state court decision "based on a factual determination
6 will not be overturned on factual grounds unless objectively unreasonable in light of the
7 evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

8     When there is no reasoned opinion from the highest state court to consider the
9 petitioner's claims, the court looks to the last reasoned opinion of a state court. *See Ylst v.*
10 *Nunnemaker*, 501 U.S. 797, 801-806 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079
11 n. 2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001). Where the state court gives no
12 reasoned explanation of its decision on a petitioner's federal claim and there is no
13 reasoned lower court decision on the claim, a federal court conducts "an independent
14 review of the record" to determine whether the state court's decision was an unreasonable
15 application of clearly established federal law. *See Plascencia v. Alameida*, 467 F.3d 1190,
16 1198 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

18     As grounds for federal habeas relief, Petitioner claims that: (1) there was not "some
19 evidence" to support the Board's denial of parole at the January 10, 2006 parole hearing;
20 (2) the denial of parole was arbitrary and capricious because the parole regulations are too
21 vague to guide discretion; and (3) the denial of parole was a breach of his plea bargain
22 agreement, and thus a violation of his due process and equal protection rights. None of
23 these claims merit habeas relief.

24 **I.    Due Process in Parole Suitability Determinations**

25     **A.    Some Evidence Standard of Judicial Review**

26     The Ninth Circuit has determined that a California prisoner with a sentence of a term
27 of years to life with the possibility of parole has a protected liberty interest in release on
28 parole and therefore a right to due process in the parole suitability proceedings. *See*

1 *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (citing *Board of Pardons v. Allen*,
2 482 U.S. 369 (1987); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S.
3 1 (1979)). *See also Irons v. Carey*, 505 F.3d 846, 851 (9th Cir.), *reh'g and reh'g en banc*
4 *denied*, 506 F.3d 951 (9th Cir. 2007); *Sass v. California Board of Prison Terms*, 461 F.3d
5 1123, 1127-28 (9th Cir. 2006), *reh'g and reh'g en banc denied*, No. 05-16455 (9th Cir. Feb.
6 13, 2007); *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003).

7      A parole board's decision satisfies the requirements of due process if "some
8 evidence" supports the decision. *Sass*, 461 F.3d at 1128-29 (adopting some evidence
9 standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55
10 (1985)). *See also Irons*, 505 F.3d at 851. "To determine whether the some evidence
11 standard is met 'does not require examination of the entire record, independent
12 assessment of the credibility of witnesses, or weighing of the evidence. Instead, the
13 relevant question is whether there is any evidence in the record that could support the
14 conclusion reached'" by the parole board. *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S.
15 at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so
16 devoid of evidence that the findings of the . . . board were without support or otherwise
17 arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

18      Respondent contends that an inmate is entitled to only minimal protections to satisfy
19 due process in a parole proceeding. Citing *Greenholtz*, Respondent contends that due
20 process in state parole procedures is satisfied merely if they afford the inmate an
21 opportunity to be heard and a decision informing him why he did not qualify for parole
22 release. The Ninth Circuit, however, has held that requiring less than the some evidence
23 standard "would violate clearly established federal law because it would mean that a state
24 could interfere with a liberty interest - that in parole - without support or in an otherwise
25 arbitrary manner." *Sass*, 461 F.3d at 1129. Thus, the some evidence standard is clearly
26 established law in the context of parole denial for purposes of federal habeas review. *Ibid.*
27      In order to determine whether the state court decisions were contrary to, or an
28 unreasonable application of, clearly established federal law, the court looks to the last

4

1  reasoned state court opinion, which is that of the superior court denying the state habeas

2  petition. Answer Ex. 12 (*In re Steele*, Case No. CR03534, slip op. (Super. Ct. Tehama Co.

3  April 19, 2005)).  *See Shackleford*, 234 F.3d at 1079 n.2.

### B. Board's Unsuitability Determination

5  In his first claim for relief, petitioner contends that his due process rights were

6  violated because the Board's decision was not supported by some evidence.  The superior

7  court denied petitioner's first claim on the following grounds:

8  As seemingly recognized by the Board of Prison Hearings Panel,
   Petitioner has made substantial efforts within the confines of the

9  prison system to make himself suitable for parole. It is, in fact,
   difficult to know exactly what more might be expected. This Court

10  notes, after reviewing the decision portion of the hearing transcript,
   that the hearing panel's reasoning is somewhat vague and

11  ambiguous as to exactly what else Petitioner needs to do in order
   to be released on parole. What is clear to this Court, however, is

12  that the Board of Prison Hearings, as it has in the past, continues
   to consider the nature of this offense. It found that it was

13  "exceptionally callous, done with a disregard for human suffering, in
   that Petitioner used a hammer to bludgeon to death the victim."

14
   While Petitioner contends it is inappropriate to continually use the

15  commitment offense to justify a denial of parole, that is precisely
   what the law allows. Unfortunately, while Petitioner can make other

16  changes, he cannot change what has already happened. The case
   of *In re Rosenkrantz* (2002) 29 Cal. 4th 616 is not only interesting

17  in that it states the law that is applicable to parole decisions by the
   Board, it also has many factual similarities to Petitioner's case,

18  including Petitioner's age at the time this offense was committed.

19  The evidence reflected by the administrative record not only
   demonstrates the nature of the offense, but also the fact that

20  Petitioner had a substantial record as a juvenile, evidencing
   considerable antisocial behavior. Although he did not have any

21  prior adult record, this offense was committed so soon after
   becoming an adult, his lack of record does not create a mitigating

22  factor. It is unfortunate, but, the fact is, it is difficult to know how
   Petitioner will cope outside of the prison system because, while his

23  conduct while incarcerated has been acceptable, the only
   indication of his conduct outside of confinement was

24  unacceptable.

25  This Court finds there was substantial evidence to support the
   decision of the Board of Prison hearings Panel. Therefore, the

26  Petition must be **DENIED**.

27  *In re Steele*, slip op. at 1-2.

28

United States District Court
For the Northern District of California

**1.    State Regulations Governing Parole Suitability**

In assessing whether the Board's denial of parole was supported by some evidence, the court's "analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851 (citing *Biggs*, 334 F.3d at 915). "Accordingly, here we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' in [petitioner's] case constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Ibid.* Under California law, "[t]he Board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal. Code. Regs., tit.15 § 2402(c)-(d)." *Ibid.*

Title fifteen, section 2402, of the California Code of Regulations sets forth the criteria for determining whether an inmate is suitable for release on parole. The circumstances tending to show that a prisoner is unsuitable include the following: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner;" (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others;" (4) commission of "sadistic sexual offenses;" (5) "a lengthy history of severe mental problems related to the offense;" and (6) "serious misconduct in prison or jail." Cal. Code. Regs., tit. 15 § 2402(c). The circumstances tending to show that a prisoner is suitable for parole include the following: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the prisoner suffered from Battered Woman Syndrome at the time of committing the crime; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner's present age reduces the risk of recidivism; (8) the prisoner "has made realistic plans for release or has developed marketable skills that can

6

1  be put to use upon release;" and (9) institutional activities "indicate an enhanced ability to
2  function within the law upon release."  Cal. Code. Regs., tit. 15 § 2402(d).

### 2.  *Biggs* Challenge

4  In support of his claim that the Board's decision was not supported by some
5  evidence, petitioner argues that the Board improperly relied on the unchanging
6  circumstances of the commitment offense and his prior history to find him unsuitable for
7  parole.  Petitioner relies on *Biggs*, where the Ninth Circuit suggested in dicta that sole
8  reliance on the commitment offense could raise "serious questions" about a state
9  prisoner's liberty interest in parole.  *See Biggs*, 334 F.3d at 916-17.  *Biggs* upheld the initial
10  denial of a parole release date based solely on the nature of the crime and the prisoner's
11  conduct before incarceration, but cautioned that the value of the criminal offense fades
12  over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity'
13  and requires a careful balancing and assessment of the factors considered. . . . A
14  continued reliance in the future on an unchanging factor, the circumstance of the offense
15  and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by
16  the prison system and could result in a due process violation."  *Biggs*, 334 F.3d at 916-17.

17  As the Ninth Circuit noted in *Sass*, "*Biggs* affirmed a denial of parole after holding
18  that the circumstances of the offense and conduct prior to imprisonment constituted some
19  evidence to support the Parole Board's decision."  *Sass*, 461 F.3d at 1126 (citing *Biggs*,
20  334 F.3d at 917).  *See Biggs*, 334 F.3d at 916 ("As in the present instance, the parole
21  board's sole supportable reliance on the gravity of the offense and conduct prior to
22  imprisonment to justify denial of parole can be initially justified as fulfilling the requirements
23  set forth by state law.").

24  The Ninth Circuit has expressed competing views on *Biggs* in subsequent panel
25  decisions.  In *Sass*, the Ninth Circuit held that evidence of Sass's prior offenses and the
26  gravity of his commitment offenses constituted some evidence to support the Board's
27  decision.  461 F.3d at 1129.  Acknowledging the cautionary statements in *Biggs* concerning
28  the potential for a due process violation by continued reliance in the future on immutable

7

1  factors, *Sass* criticized that part of the opinion as improper speculation about how future
2  parole hearings could proceed. *Ibid.*

3       In *Irons*, however, the Ninth Circuit echoed the concern raised in *Biggs* and
4  expressed its "hope that the Board will come to recognize that in some cases, indefinite
5  detention based solely on an inmate's commitment offense, regardless of the extent of his
6  rehabilitation, will at some point violate due process, given the liberty interest in parole that
7  flows from the relevant California statutes." *Irons*, 505 F.3d at 854 (citing *Biggs*, 334 F.3d
8  at 917). Although the court determined that the Board's unsuitability finding was supported
9  by "some evidence" that Irons's crime was especially cruel and callous, the *Irons* panel
10  pointed out that in the cases holding that sole reliance on the commitment offense did not
11  violate due process, namely, *Irons*, *Sass* and *Biggs*, "the decision was made before the
12  inmate had served the minimum number of years required by his sentence." *Irons*, 505
13  F.3d at 852-54. *Irons* reasoned that due process was not violated when these prisoners
14  were deemed unsuitable for parole "prior to the expiration of their minimum terms," even if
15  they had demonstrated substantial evidence of rehabilitation. *Id.* at 854.

16       Recently, the Ninth Circuit held rehearing en banc in *Hayward v. Marshall*, 512 F.3d
17  536 (9th Cir.), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008), which presented a
18  state prisoner's due process habeas challenge to the denial of parole. The three-judge
19  *Hayward* panel had concluded that the gravity of the commitment offense had no predictive
20  value regarding the petitioner's suitability for parole, and held that the governor's reversal
21  of parole was not supported by some evidence and resulted in a due process violation.
22  512 F.3d at 546-47. The Ninth Circuit has not yet issued an en banc decision in *Hayward*;
23  since holding rehearing en banc on June 24, 2008, the Ninth Circuit has ordered briefing
24  on the questions, *inter alia*, whether the order granting rehearing en banc should be
25  vacated and submission of the matter deferred, pending the California Supreme Court's
26  decisions in *In re Lawrence*, No. S154018 and *In re Shaputis*, No. S155872, both of which
27  cases were argued on June 4, 2008. *Hayward v. Marshall*, No. 06-55392, slip op. at 2 (9th
28  Cir. July 10, 2008).

8

1       Unless or until the en banc court overrules the holdings of the earlier Ninth Circuit
2   panel decisions in *Biggs*, *Sass* and *Irons*, these cases hold that California's parole scheme
3   creates a federally protected liberty interest in parole and therefore a right to due process
4   which is satisfied if some evidence supports the Board's parole suitability decision. *Sass*,
5   461 F.3d at 1128-29.  These cases also hold that the Board may rely on immutable events,
6   such as the nature of the conviction offense and pre-conviction criminality, to find that the
7   prisoner is not currently suitable for parole, *Sass*, 461 F.3d at 1129.  *Biggs* and *Irons*
8   further suggest, however, that over time, the commitment offense and pre-conviction
9   behavior become less reliable predictors of danger to society such that repeated denial of
10  parole based solely on immutable events, regardless of the extent of rehabilitation during
11  incarceration, could violate due process at some point after the prisoner serves the
12  minimum term on his sentence. *See Irons*, 505 F.3d at 853-54.

13      Relying on *Biggs* and *Irons*, petitioner contends that the commitment offense is no
14  longer a reliable predictor of his present and future dangerousness and does not satisfy the
15  "some evidence" standard.  Respondent counters that the court may not grant relief on the
16  purported *Biggs* claim because *Biggs* is not clearly established federal law as determined
17  by the Supreme Court.  Assuming, without deciding, that under some circumstances,
18  habeas relief may be granted under *Biggs* on a claim that parole denial based on the
19  Board's sole reliance on the commitment offense and other unchanging factors does not
20  satisfy the some evidence standard, the court finds that petitioner fails to establish the
21  predicate for a *Biggs* claim because the Board did not rely solely on the unchanging factors
22  of his commitment offense and prior criminal history, but also his lack of realistic parole
23  plans, as discussed further below.

24          **3.    Parole Unsuitability**

25      At the January 2006 hearing, the Board considered the commitment offense,
26  petitioner's prior criminal and social history, parole plans, institutional behavior, correctional
27  counselor's evaluation, and psychological report.  Answer Ex. 2 at 7.  The Board
28  considered several factors favoring petitioner's suitability for parole, including petitioner's

9

1 remorse and insight into the crime, favorable institutional behavior, good disciplinary
2 record, educational and vocational training, and commitment to staying sober through his
3 participation in Alcoholics Anonymous and other self-help programs.[1]  Id. at 57-61, 78, 89-
4 91.  Petitioner received only one "115" serious rules violation report during his
5 incarceration, which was issued during his first year in prison, and three "128" counseling
6 memos, the last one being issued in 1985.  Id. at 59-60.

7 Having considered factors of suitability, the Board nonetheless concluded that
8 petitioner posed an unreasonable risk of danger to society and a threat to public safety if
9 released from prison based on the following factors of unsuitability: (1) the commitment
10 offense was carried out in an especially cruel manner; (2) petitioner failed to profit from
11 society's previous attempts to correct his criminality; and (3) inadequate parole plans.

## a.   Commitment Offense

13 The regulations provide that the Board may consider the following factors in
14 determining whether the commitment offense was "especially heinous, atrocious or cruel:"
15 (A) multiple victims were attacked, injured or killed in the same or separate incidents;
16 (B) the offense was carried out in a dispassionate and calculated manner, such as an
17 execution-style murder; (C) the victim was abused, defiled or mutilated during or after the
18 offense; (D) the offense was carried out in a manner which demonstrates an exceptionally
19 callous disregard for human suffering; (E) the motive for the crime is inexplicable or very
20 trivial in relation to the offense.  Cal. Code Regs., tit. 15 § 2402(c)(1).

21 Petitioner discussed the details of the crime at the hearing: at the time of the
22 commitment offense, petitioner was eighteen years old and homeless because his family
23 threw him out of their home after several warnings over his drinking and stealing.  Id. at 28.
24 Petitioner and his friend, Leonard, met the victim in a park on New Year's Eve when the

---

26 [1]     The court notes that the transcript of the Board hearing transcribing the discussion of petitioner's positive programming in prison is incomplete due to a complication in the tape-recording.  Answer Ex. 2 at 61.  The basis of the Board's decision is, however, completely transcribed.  Id. at 89-100.  Furthermore, the counselor's evaluation summarizes petitioner's custody history, therapy and self-help activities while incarcerated, and his disciplinary history.  Answer Ex. 9 at 3-6.

1 victim, who was in his mid-50's, offered them beer. *Id.* at 29. The three went to the
2 victim's house and drank beer for a few hours and the victim offered petitioner and Leonard
3 a place to stay. *Ibid.* The victim drove petitioner and Leonard to a party after stopping for
4 a case of beer, which the three drank. *Id.* at 30. Petitioner recalled that while the victim
5 was driving, his hand was on Leonard's leg. *Ibid.* Petitioner asked the victim for a ride
6 from the party, and returned to the victim's house. *Id.* at 30-31. The victim went to his
7 bedroom, and re-appeared wearing only a tee-shirt and asked petitioner into the bedroom.
8 *Id.* at 31. Petitioner decided to leave, but got angry, turned back and went into the
9 bedroom when the victim called him again. *Id.* at 31-32. The victim was lying in the bed
10 and exposed himself to petitioner, making sexual remarks. *Id.* at 32. Petitioner stated that
11 he grabbed a hammer that was on the nightstand next to the victim's bed, hit the victim in
12 the head and chest, and saw the victim take his last breath. *Ibid.* Petitioner remembers
13 walking into the victim's bathroom, trying to wash off the blood, and then driving in the
14 victim's car. *Ibid.* The police pulled him over, and petitioner cried and confessed to killing
15 the victim. *Id.* at 33-34. Petitioner acknowledged that the police found the victim's
16 checkbook and stereo in the victim's car when petitioner was stopped, but he did not
17 remember taking anything that night. *Id.* at 73-75. Petitioner recalled that the victim had
18 the checkbook with him in the car as they were driving, which is consistent with a witness
19 statement in the police records that the victim had paid for beer by check earlier on the
20 night of the commitment offense. Answer Ex. 10 (Red Bluff Police Dept. Supplemental
21 Continuation Report, Jan 29, 1981). Petitioner could not remember clearly what happened
22 when he was stopped by the police because he was drunk at the time; his blood alcohol
23 level was reported as 0.15. *Id.* at 34, 47.

24      The District Attorney for Tehama County appeared at the hearing to oppose
25 petitioner's parole suitability, and commented that petitioner used so much force and
26 inflicted so much damage and pain to the victim as to cause his death. Answer Ex. 2 at
27 68-69. The record before the Board included police department files submitted by the
28 Tehama County District Attorney's Office for consideration at petitioner's parole suitability

United States District Court
For the Northern District of California

1 hearings. Answer Ex. 10. The coroner's investigation concluded that the victim died of
2 hemorrhage and laceration of the brain due to multiple skull fractures and blunt force
3 trauma. Answer Ex. 10 (Investigation and Verdict, Jan. 9, 1981). The necropsy report
4 indicates that the victim suffered a total of eleven lacerations and abrasions to his face and
5 skull, multiple rib fractures, and lacerations on the victim's right forearm, wrist and hand.
6 Answer Ex. 10 (Coroner's Office Necropsy Report, Jan. 2, 1981). The record therefore
7 contains some evidence to support the Board's determination that petitioner carried out the
8 commitment offense "in a manner which demonstrates an exceptionally callous disregard
9 for human suffering in that the inmate used a hammer to bludgeon to death the victim."
10 Answer Ex. 2 at 90.

11 **b. Prior History**

12 The Board reviewed petitioner's juvenile record, noting that petitioner was first
13 arrested in 1975 at the age of thirteen for petty theft, for which he served twelve days in
14 juvenile custody. Answer Ex. 2 at 42. Four more juvenile petitions were filed against him
15 between February and April, 1977, for throwing rocks at vehicles, resisting arrest, escaping
16 juvenile hall, and damaging a place of confinement. *Ibid.* Petitioner was sent to the
17 California Youth Authority ("CYA") for a ninety-day evaluation followed by thirty days of
18 confinement, after which he was placed in a foster home. Answer Ex. 9 at 2. In December
19 1977, petitioner received a juvenile petition for malicious mischief and was remanded to a
20 boys' ranch, but was returned to the juvenile authorities because he refused to stay there.
21 Answer Ex. 2 at 43. He was sentenced to the CYA for nine months. *Ibid.* Petitioner's only
22 adult arrest and conviction was for the commitment offense when he was age eighteen.
23 Answer Ex. 9 at 3.

24 The record contains some evidence to support the Board's determination that "the
25 inmate has failed to profit from society's previous attempts to correct his criminality, and
26 these attempts include juvenile boys' ranch, jail, and a CYA commitment, and he also has
27 a history of petty theft, alcohol abuse, truancy, and escape from the boys' ranch." Answer
28 Ex. 2 at 91.

United States District Court
For the Northern District of California

12

1

### c.    Parole Plans

2      At the hearing, petitioner discussed his plans to stay at a faith-based residential
3   rehabilitation center in Chico which offered a daily recovery program including 12-Step
4   meetings focused on relapse prevention, anger and stress management, vocational
5   training and drug testing. Answer Ex. 2 at 49.  The District Attorney, however, pointed out
6   that the rehabilitation center likely would charge petitioner four hundred dollars per month
7   to stay there, and raised concerns about petitioner's ability to find a job in the Chico area,
8   or Butte County, where there are not many employment opportunities. *Id.* at 79-80.

9      Petitioner also obtained letters of support from family members offering him a place
10   to live in either the Chico or Red Bluff areas, as well as financial support and help with job
11   placement. *Id.* at 51-54.  With respect to potential employment, petitioner relied on his job
12   training in staining antique furniture at the prison, sheet metal and laundry experience, and
13   forklift driver's license, noting that there is a Wal-Mart distribution center in the Red Bluff
14   area in Tehama County. *Id.* at 57-58.  Again, the District Attorney raised concerns about
15   viable employment opportunities in Tehama County, other than the Wal-Mart center there.
16   *Id.* at 80-81.

17      The District Attorney also emphasized petitioner's psychological evaluation, dated
18   August 2004, which determined that petitioner's future behavior is "very difficult, if not
19   impossible, to predict," and questioned how petitioner would succeed outside of a
20   controlled environment. *Id.* at 81.  There, Dr. Kornberg opined, "Although he has
21   reportedly not acted in an aggressive manner toward others in the correctional system for
22   many years, his potential behavior, once released, remains unclear.  Given the lack of daily
23   structure regarding his plans, once released, he is at risk of relapse on substances."
24   Answer Ex. 8 at 10.  The Board did not accept Dr. Kornberg's conclusion that petitioner
25   posed a moderate risk of recidivism, and found instead that petitioner "has overcome and
26   made a commitment to overcome his drinking problem and made a commitment to
27   remaining sober." Answer Ex. 2 at 91.  The Board did, however, find that petitioner needed
28   to make better parole plans because "we want to make sure that you're going to go to a

13

1  place in a location where you are going to be able to succeed and meet your potential." *Id.*
2  at 92.

3  Although the Board did not find it necessary for petitioner to have a solid job offer to
4  be suitable for parole, and even acknowledged the difficulty of obtaining a job offer from
5  prison, the Board expressed its doubt that petitioner would logically and feasibly succeed
6  outside of prison. *Id.* at 92-93, 97-99. The Board agreed that the residential rehabilitation
7  center in Chico was a good option, but suggested that petitioner contact them in advance
8  and determine whether it is a credible program, whether he would have to pay four
9  hundred dollars per month to stay there, and how he would pay that amount. *Id.* at 97.
10  The Board also expressed concern that the rehabilitation center was "religious based, and I
11  don't know that you're going to find that helpful." *Id.* at 92. When asked earlier whether he
12  was a religious person, petitioner merely replied, "I have beliefs." *Id.* at 49.

13  In announcing the Board panel's decision denying parole, a member of the panel
14  commented that even if it granted parole, the full Board reviewing the panel decision could
15  reverse based solely on insufficient parole plans. *Id.* at 92. The panel acknowledged that
16  the full Board's likely decision on review was not itself a reason to deny parole, but also
17  noted that "our comfort level isn't there. Okay. And we have to feel comfortable that you're
18  going to be able to succeed, and we're just not feeling that." *Id.* at 92-93.

19  The record therefore contains some evidence to support the Board's determination
20  that petitioner did not have realistic plans for release.

21  Contrary to petitioner's claim that the Board's decision violated his right to due
22  process, the record contains some evidence to support the Board's parole unsuitability
23  determination. The state courts' denial of habeas relief on this claim was neither contrary
24  to, nor an unreasonable application of, clearly established federal law.

25  **C. Vagueness Challenge**

26  In his second claim for relief, petitioner argues that the parole regulation's phrase
27  "especially heinous, atrocious, or cruel" is unconstitutionally vague. He fails to
28  acknowledge that the language following this phrase provides a list of five factors to

14

1   consider when determining whether a crime is especially "heinous, atrocious or cruel,"
2   including the presence of multiple victims, the abuse or mutilation of the victim and a trivial
3   motive for the crime. *See* 15 Cal. Code Regs. § 2402(c)(1)(A)-(E). The term "especially
4   heinous, atrocious, or cruel," as further limited by five detailed factors, is not
5   unconstitutionally vague. *Cf. Arave v. Creech*, 507 U.S. 463, 470-78 (1993) (Idaho death
6   penalty statute citing as an aggravating factor crimes carried out in an "utter disregard for
7   human life" was not impermissibly vague because limiting construction had been adopted
8   which defined factor as those crimes demonstrating "the utmost disregard for human life,
9   i.e., the cold-blooded pitiless slayer"). "The Due Process Clause does not require the
10  same precision in the drafting of parole release statutes as is required in the drafting of
11  penal laws." *Hess v. Board of Parole and Post-Prison Supervision*, 514 F.3d 909, 913-14
12  (9th Cir. 2008).

13          Not only does the facial challenge to the regulation fail, but petitioner cannot assert
14  an as-applied challenge because his commitment offense fit within one of the listed factors
15  to be considered in determining whether the offense was committed in an especially
16  heinous, atrocious or cruel manner: "the offense was carried out in a manner which
17  demonstrates an exceptionally callous disregard for human suffering." Cal. Code Regs., tit
18  15 § 2402(c)(1)(D). Petitioner killed the victim by bludgeoning him in the head and chest
19  with a hammer multiple times with enough force to fracture the victim's skull. The state
20  courts' rejection of this claim was not an objectively unreasonable application of clearly
21  established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

22  **II.     Plea Agreement**

23          In Claim Three, petitioner contends that by denying him parole the Board has
24  breached his plea bargain, because it is in effect treating him as if he had been convicted
25  of first-degree murder. In the absence of a reasoned state court opinion addressing this
26  claim, the court conducts an independent review of the record.

27          The breach of plea agreement claim is time-barred. "A 1-year period of limitation
28  shall apply to an application for a writ of habeas corpus by a person in custody pursuant to

1   the judgment of a State court." 28 U.S.C. § 2244(d)(1). A habeas petition by a state
2   prisoner challenging a decision of an administrative body, such as the Board, is covered by
3   the statute and the limitations period starts to run from "the date on which the factual
4   predicate of the claim or claims presented could have been discovered through the
5   exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D); *Shelby v. Bartlett*, 391 F.3d 1061,
6   1066 (9th Cir. 2003); *see also Redd v. McGrath*, 343 F.3d 1077, 1081-82 (9th Cir. 2003).
7   Petitioner alleges that he "plead guilty with the common belief that when the fifteen (15)
8   years were completed, whether good-time credits were applied or not, he would be
9   released." Pet. at 23. Thus, the factual predicate or basis of petitioner's claim that his plea
10  agreement was violated was known to him in 1996, when he had served fifteen years in
11  custody and he was not paroled or given a parole date. Petitioner's claim thus accrued no
12  later than 1996 and he did not file this federal habeas petition within the one-year
13  limitations period. He could not revive the time-barred claim by asserting that the
14  agreement – which by his account was irrevocably breached in 1996 – was breached again
15  in 2006, no more than one can revive a time-barred claim on a contract by demanding a
16  new performance and alleging a new breach years after the contract has been irrevocably
17  breached.

18      Even if the claim were not barred by the statute of limitations, the breach of plea
19  bargain claim has no merit. "'Plea agreements are contractual in nature and are measured
20  by contract law standards.'" *Brown v. Poole*, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting
21  *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993)). Although a criminal
22  defendant has a due process right to enforce the terms of a plea agreement, *see*
23  *Santobello v. New York*, 404 U.S. 257, 261-62 (1971), there is no evidence that petitioner's
24  subjective expectations about how parole would be decided were part of the plea
25  agreement.

26      Petitioner relies on *Brown*, where the defendant avoided prosecution for first degree
27  murder by pleading guilty to second degree murder. The Ninth Circuit reviewed the plea
28  transcript and held that it was undisputed that the prosecutor promised the defendant

16

1  during the plea colloquy that she would "get out in half the time" if she behaved well in
2  prison. *Brown*, 337 F.3d at 1158-59. Based on this evidence, the court ordered the
3  prisoner's release. *Id.* at 1160. Here, in contrast to *Brown*, there is no evidence supporting
4  petitioner's breach of plea agreement claim. The plea transcript demonstrates that the
5  superior court informed petitioner that by entering the plea of guilty to second degree
6  murder, he could be incarcerated from fifteen years up to the balance of his natural life,
7  and that anyone's representation that petitioner's sentence would be anything other than
8  fifteen-to-life would be inappropriate.[2] Suppl. Habeas Rec. at 16, 21. The superior court
9  was satisfied that petitioner's plea entry was voluntary, knowing and intelligent. *Id.* at 32.

10  Unlike the petitioner in *Brown*, petitioner has not pointed to any language in the plea
11  transcript or any plea agreement, oral or written, that shows that any particular promise
12  was made. Petitioner's sentence upon his conviction based on a plea agreement was
13  fifteen years-to-life and not a straight fifteen-year sentence. At the time of the January
14  2006 Board hearing, petitioner had served twenty-five years of his sentence and had been
15  considered for parole thirteen times. He has received the parole considerations to which
16  he was entitled.

17  In support of his argument that he had a reasonable expectation to be paroled if he
18  behaved well in prison, petitioner also relies on the regulation that contains a matrix of
19  suggested base terms for several categories of crimes. *See* Cal. Code Regs., tit. 15
20  § 2403. However, the relevant statute and regulations require that the inmate first be
21  found suitable for parole before the matrix is consulted. *See* Cal. Penal Code § 3041; Cal.
22  Code Regs., tit. 15 § 2402; *Dannenberg*, 34 Cal. 4th at 1070-71; Cal. Code Regs., tit. 15
23  § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for
24  parole"). Petitioner has not been found suitable, so the matrix is not yet applicable.

25  This claim is without merit. The state courts' rejection of petitioner's claim was not
26  objectively unreasonable.

27

28  [2] Respondent's objection to the court's review of the plea transcript is overruled in light of *Brown*, 337 F.3d at 1159.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

## CONCLUSION

Based on the foregoing, the petition for a writ of habeas corpus is DENIED.  The clerk of the court shall terminate all pending motions, enter judgment for respondent, and close the file.

**IT IS SO ORDERED.**

Dated:  _August 21_, 2008.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.06\STEELE7470.deny.wpd

18